# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| IN RE ) | |
| ) | |
| DIAMOND SPRINGS RANCH, ) | Case No. 11-20034-TLM |
| LLC, ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| _____ ) | |

## MEMORANDUM OF DECISION

## INTRODUCTION

Before the Court in this chapter 11 case are matters related to relief from the automatic stay of § 362(a) and approval of a proposed disclosure statement under the standards of § 1125.[1]  A final evidentiary hearing under § 362(e) on the stay relief motion, and on adequacy of the disclosure statement, was held on June 7, 2011.  Both matters were then taken under advisement.[2]

## BACKGROUND AND FACTS

Diamond Springs Ranch, LLC ("Debtor") filed its voluntary petition for chapter 11 relief on January 12, 2011, commencing this case.  The petition

---

[1] Unless otherwise indicated, all chapter, section and other statutory references are to the Bankruptcy Code, Title 11, U.S.C. §§ 101-1532 (the "Code"), and all rule references are to the Federal Rules of Bankruptcy Procedure 1001-9037.

[2] This Decision constitutes the Court's findings of fact and conclusions of law on all pending matters.  Fed. R. Bankr. P. 7052, 9014.

MEMORANDUM OF DECISION - 1

indicates, and Debtor concedes, this is a single asset real estate case under § 101(51B).

Debtor was formed in 2004. Debtor is a wholly-owned subsidiary of R & R Development, Inc. ("R & R"), a corporation formed in 2004. The president of R & R and the manager of Debtor is Ray Hamell. Mr. Hamell has been involved in real estate since 1972 in Ada, Valley and Idaho Counties and has lived in Riggins, Idaho since 1984.

Debtor is the owner of the real estate upon which it and R & R are developing a large-lot, residential subdivision near the Little Salmon River, south of Riggins, in Idaho County, Idaho. Global Credit & Mortgage, LLC ("Global") is a secured creditor on that real estate. Global originally loaned $460,000 in 2004 to allow Debtor to acquire the real estate. Phase I of the development (a number of riverfront lots) were developed and sold.[3] Debtor paid down the initial borrowing to some extent. Phase II of the development was commenced. Additional lending for operations was made by Global.

Global is owed $387,426.94 on the original financing. Ex. 200. Global is also owed $158,831.95 on a subsequent operating capital loan. Ex. 201. All these amounts are secured by a lien on 25 lots in Phase II.[4] This total indebtedness of

---

[3] None of Phase I is owned by Debtor or involved in this bankruptcy.

[4] Debtor has additional property, including common areas in the development, totaling
(continued...)

MEMORANDUM OF DECISION - 2

$546,258.89 as of the January 12, 2011, petition date will have grown to over $575,000 given the accrual of post-petition interest, if Global is oversecured as Debtor contends. Ex. 202.[5] *See* § 506(b).

Debtor's real estate development is in a rugged, remote and mountainous area, though located near a public road. The lots are designed for retirement or second-home residences and vary in size.[6] Many of the lots have views, and the development is primarily on a south-east facing hillside with moderate grades, enhancing winter access. Some, but not all, of the planned dirt and gravel roads in the subdivision are constructed. Underground utilities are available for some, but not all, of the lots. There are wells drilled in the development, which will service some of the lots, a feature that enhances the value of lots in this area where significant costs can be incurred for property owners to sink their own wells. Completion of this amenity will, however, require pumps, electricity, and connections which are not in place at this time.

Three lots in Phase II of the project were sold in early 2007. There are no

---

[4] (...continued)
about 98 acres and upon which Global has no lien. Ex. 106 at 7. Parts of the overall Diamond Springs Ranch development are owned by R & R or third parties and are similarly not encumbered by liens in favor of Global. Ex. 206.

[5] This exhibit shows an accrual of $5,763.52 per month. *Id.*

[6] For example, lot 5 is about 19 acres and lot 6 is approximately 20 acres. Lots 7, 9 and 11 vary from about 2.3 acres to 8.2 acres. Outside of these five lots (sometimes referred to in this Decision as "prime" lots given testimony about their assessed or asserted values), lot sizes vary from around 2.5 acres to almost 14 acres, with most in the 4 to 8 acre range. Ex. 101.

MEMORANDUM OF DECISION - 3

residences constructed on these sold lots. No lots were sold from that point through the date of the chapter 11 filing in January, 2011. A re-listing of lots, and a proposed and advertised public auction of lots in June, 2010, failed to generate any buyers.[7]

Overall, about 1/3 of the development is represented to be market-ready or close to it, with lots 5, 6, 7, 9 and 11 the most highly valued through assessment and otherwise. About 1/3 of the development has not been started beyond platting, and the remaining 1/3 is somewhere between the two extremes.

The absence of sales from 2007 through 2011 is indicative of the extraordinarily poor market for properties of this type during those years. The last lot sale in Phase II of the development was in February, 2007. The testimony at hearing indicates that there has been only limited interest by prospective buyers in properties of this sort over these several years, and very few sales. Larry Simonson, an area broker, noted two closed sales in 2010 (neither in Debtor's project), with those properties having been on the market 1 and 4 years, respectively. He also noted a recent, still-pending sale, and a recent offer for a property that had been on the market for 4 years. Another broker, Vickie Heath, had a recent sale of a lot. She characterized buyer interest recently as a little better than that in 2010. She opined that, if listed correctly, Debtor might be able to sell

---

[7] Since only one bidder showed for the auction, it was cancelled.

MEMORANDUM OF DECISION - 4

two lots per year at an amount of about $50,000 each.[8]

Given the lack of market activity, valuation of the Debtor's real property assets, and Global's security, is difficult.

Debtor contends that the value of the property is $1,035,944. *See*, *e.g.*, Doc. No. 48 (brief) at 2; Ex. 102. Debtor arrives at this figure by using the 2010 tax assessment valuations for lots 5, 6, 7, 9 and 11. Ex. 102. It does so even though, as Mr. Hamell conceded during examination, Debtor previously (though unsuccessfully) filed a protest of the valuations on these lots with Idaho County, claiming they were unreasonably high.[9]

Debtor's valuation figure uses (in lieu of either a market analysis[10] or solely assessed values[11]) an "allocated cost" approach to the other lots in Phase II that secure Global. This approach, according to Debtor, takes the capital costs of the

---

[8] Global argued that this estimate was unduly high, noting Ms. Heath's cross-examination testimony regarding a recent sale of a somewhat comparable building lot for $30,000.

[9] In addition to the assessed values being impeached by Debtor's prior protest of the assessments, Mr. Hamell's testimony regarding his personal opinion of the values of the five lots also varied from the assessments. In general, his values for lots 5, 6 and 11 were less than the assessed values, and his values for lots 7 and 9 were somewhat higher. Some of his valuations were given in ranges (*i.e.*, from $85,000 to $100,000 for lot 5). Ultimately, his testimony suggested values from $370,000 to $395,000 for the five lots. The assessed values for the five lots was $423,865. Ex. 102.

[10] Mr. Hamell testified that Debtor had hired an appraiser, who had completed his work. However, no appraiser was called to testify and no conclusions of any appraiser were offered.

[11] The total assessed valuation for all the Phase II lots in the development securing Global is $426,793, of which $423,865 represents the five lots that were unsuccessfully protested. *See* Ex. 102.

MEMORANDUM OF DECISION - 5

development and allocates the same on a per lot basis. Exs. 101, 102. Debtor believes this approach supports the other $601,191 of value it contends exists for the lots other than lots 5, 6, 7, 9 and 11, yielding the total asserted value of $1,035,944.

Predictably, this approach was challenged by Global. During cross-examination, Mr. Hamell conceded that just because capital costs were contributed to the project's development did not inherently or inevitably mean that the lots were worth the allocated portion of costs spent. He also conceded that it was not necessarily a given that all invested costs would be recouped when lots were sold, and that sales prices depended on the market. For example, the well and water-pumping infrastructure might make the lots more attractive to buyers than similarly-sized residential lots in the general area without water or wells, and thus worth "more" to buyers. The two brokers agreed with this general observation. But the evidence did not establish that the prices that would be paid for lots in Debtor's project in the current market would fully recoup the allocated cost associated with this amenity, or any other.[12]

Debtor is "not an operational company." Ex. 106 (disclosure statement) at

---

[12] Also relative to valuation, Global noted that the abortive June, 2010, auction included minimum selling prices. These prices were established by Debtor and R & R, without Global's input but accepted by Global conditioned on agreements as to how sales would be closed. The minimum acceptable selling prices ranged from $15,000 to $35,000. *See* Ex. 207.

MEMORANDUM OF DECISION - 6

6. It depends on real estate sales to generate revenue. *Id.* Since filing, Debtor has proposed no sales of property under § 363. The monthly operating reports ("MOR") of Debtor, *see* Doc. No. 25 (Jan. 2011), Doc. No. 32 (Feb. 2011), Doc. No. 42 (Mar. 2011), and Doc. No. 53 (Apr. 2011), show no income generation from sales or other operations, and no business activity.[13]

Debtor filed its proposed chapter 11 disclosure statement, Doc. No. 36, and proposed chapter 11 plan, Doc. No. 37, on April 15, 2011. Exs. 106, 107. The plan classifies two secured creditors, Global and Idaho County for past due real property tax claims. It indicates there are no unsecured creditors.[14] The plan proposes to rewrite and reamortize Global's secured claims over 20 years at 5% with monthly payments of $2,446.85 and $1,048.22 on the original and operating capital loans, respectively, with a balloon payment three years from confirmation for all unpaid amounts, accrued interest, and attorneys' fees. Ex. 107 at 5-6. Performance of the plan is based on an "anticipated capital contribution" of $50,000 from R & R (from sale of certain R & R assets); "infusion" of additional funds by R & R through its "contracting projects" and a cell phone tower lease;

---

[13] The February and March reports were introduced as Exs. 203 and 204. The Court takes judicial notice of the others. Fed. R. Evid. 201.

[14] Debtor's schedules, copies of which are attached to the proposed disclosure statement, Ex. 106, are consistent in showing only two creditors, though they list Global as secured and Idaho County as a priority unsecured creditor.

MEMORANDUM OF DECISION - 7

and Debtor's future lot sales, projecting at least two such sales per year.[15]

On March 18, Global filed its amended motion for relief from stay, Doc. No. 30 ("Stay Motion"). Following a preliminary hearing, the Stay Motion was set for a final evidentiary hearing under § 362(e). As noted, that hearing occurred on June 7. Hearing on the adequacy of Debtor's disclosure statement under § 1125, challenged by Global's objection, was simultaneously heard.

## DISCUSSION AND DISPOSITION

### A. Stay relief

Global contends relief from the automatic stay of § 362(a) is proper under § 362(d)(1), (2) and/or (3). Doc. No. 30 at 5.

#### 1. Stay relief under § 362(d)(2)

Stay relief is be proper under § 362(d)(2) if (A) there is no equity in the property and (B) the property is not necessary for an effective reorganization. Under § 362(g)(1), Global has the burden of proof as to Debtor's equity. For stay relief purposes, "equity" exists if the value of the property exceeds all claims secured by that property, whether those claims belong to the moving creditor or others. *In re Jordan*, 392 B.R. 428, 447 (Bankr. D. Idaho 2008) (citing *Pistole v.*

---

[15] The disclosure statement indicates that R & R will contribute funds to Debtor to maintain required payments to creditors while the development is being completed and lot sales are sought. Ex. 106 at 6. R & R is an "equity holder" under the plan, and will retain its interests in Debtor. It is also party to an exclusive "development agreement" with Debtor that Debtor proposes to assume under § 365.

MEMORANDUM OF DECISION - 8

*Mellor (In re Mellor)*, 734 F.2d 1396, 1400 n.2 (9th Cir. 1984)).

On the evidence of value that was presented, the Court concludes that Global's burden is met. The values attributed to the property by the Idaho County assessor for the five prime lots (5, 6, 7, 9 and 11) is $423,865. Ex. 102. The values for the remainder of the Phase II lots, according to the assessor, is $2,928 and the total assessed value of all lots securing Global is $426,793. *Id.* This figure is $119,465.89 less than the claim of Global as of filing, which was $546,258.89. Exs. 200, 201. And the testimony of Mr. Hamell, in which he opined that some of the five prime lots were worth more than assessed values but some worth less, further exacerbates the shortfall.[16] The fact that there are also real property tax debts (some $7,149 according to the disclosure statement and plan) further impacts the likelihood of any equity.

While the testimony suggests that some of the 20 lots outside of the five "prime" lots might have value beyond the relatively small amounts of their assessed values, the testimony also suggests that at least a third of Phase II is effectively undeveloped, and another portion only preliminarily or partially developed. There are areas where the roads are not completed, and lots are not accessible. The well and water distribution amenities are not fully complete.

---

[16] Recall, Mr. Hamell expressed ranges of values for these five lots suggesting total values for the five lots of $370,000 to $395,000. When contrasted to the assessor's values for those five lots (*i.e.*, $423,865), the extent of the shortfall is increased another $28,865 to $53,865.

MEMORANDUM OF DECISION - 9

There are some erosion or slide conditions at the entry of the development that are potentially discouraging to prospective buyers. There are competing residential developments and building lots for sale. And all witnesses conceded the dismal nature of the market for the past several years. And there was only limited – and somewhat speculative – testimony to suggest possible improvements in the Riggins area residential market for properties of this sort.

Were there to be more value attributed to the balance of the Phase II lots (other than the prime five) securing Global, it would have to be a substantial amount before there would be any equity. Global has a total claim of $546,258.89 as of the petition date. Interest accruals allowable under § 506(b) have added another $29,000, roughly, to date. Global is further entitled to reasonable attorneys' fees under their security documents and § 506(b).[17]

Global has met its burden of establishing a lack of equity. The nature and extent of arguably countervailing evidence was insufficient to alter this conclusion. There is no "equity" under § 362(d)(2)(A).

However, relief under § 362(d)(2) requires a finding not only of lack of equity but also, under § 362(d)(2)(B), that the property is not necessary for an effective reorganization. This requires an evaluation of whether Debtor has

---

[17] Because Debtor takes the position there is equity and Global is oversecured, its plan proposes to establish the amount of Global's claim, including accruing interest and reasonable attorneys' fees and costs, as of the confirmation date, and to include such components in the total amount of the claim to be amortized and paid. Ex. 107 at 6.

MEMORANDUM OF DECISION - 10

proven there is "a reasonable possibility of a successful reorganization within a reasonable time." *Jordan*, 392 B.R. at 450 (quoting *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988)). Inasmuch as this test is so similar to that of § 362(d)(3)(A), and since § 362(d)(3) has special application to a single asset real estate case such as this, the Court will discuss it further below.

### 2.     Stay relief under § 362(d)(3)

Under the pertinent portions of § 362(d)(3), the Court must grant stay relief

> (3) with respect to a stay of an act against single asset real estate . . . by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief . . .
>
>   (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable period of time; or
>
>   (B) the debtor has commenced monthly payments that –
>
>      (i) may . . . be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property . . . and
>
>      (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate[.]

Section 362(d)(3).

Debtor had not, as of the hearing (and certainly not within the first 90 days of the case), commenced making payments to Global. Therefore, the alternative

MEMORANDUM OF DECISION - 11

defense to stay relief found in § 362(d)(3)(B) is not applicable, and the inquiry must turn to § 362(d)(3)(A). According to one treatise:

> The purpose of section 362(d)(3) is to address perceived abuses in single asset real estate cases, in which debtors have attempted to delay mortgage foreclosures even when there is little chance that they can reorganize successfully. Section 362(d)(3) attempts to shorten such cases by requiring that the court grant relief from the stay if a reasonable plan is not filed promptly or payments are not commenced.

3 Collier on Bankruptcy ¶ 362.07[5][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

The § 362(d)(3) goal of accelerated presentation of a chapter 11 plan is met in the instant case, but the precise requirements of the Code are not. Debtor filed its plan on April 15, 2011, a date 93 days after the petition date and, thus, the order for relief. It is therefore clear Debtor did not meet the specific 90-day window for the filing of a plan required by § 362(d)(3)(A).[18]

But even if it is argued that three days late is "close enough," the plan that is filed must have a "reasonable possibility of being confirmed within a reasonable time." § 362(d)(3)(A). The Court concludes that Debtor has failed to carry its

---

[18] As noted, § 362(d)(3)(A) states that the court "shall grant relief" from the stay of an act against single asset real estate by a creditor secured in such real estate "unless, *not later than the date that is 90 days* after the entry of the order for relief" the debtor has filed a plan that has a reasonable possibility of being confirmed in a reasonable time. (Emphasis added.) The 90-day deadline can be extended, but only on request made before its expiration. *Id.*

MEMORANDUM OF DECISION - 12

burden on this element.[19]

Debtor has no income. It is totally dependent on infusions from R & R to make any payments, not only to creditors but to its own professionals and on U.S. Trustee's fees and other administrative expenses. There are representations, though evidently no absolutely enforceable commitments, for R & R to provide the funding required.

This sort of funding is the bridge until Debtor generates lot sales. There is little evidence to support the idea that sufficient lot sales will occur. Even if Debtor's best evidence, Ms. Heath's suggestion of two lot sales per year at $50,000 each, is accepted, Debtor has insufficient resources with which to perform its plan. That sort of income generation will not substantially reduce the debt owed Global, particularly if Debtor is unsuccessful in advocating that a 5% interest rate meets the requirements of case law. There is no evidence to support the proposition that Debtor will be able to obtain the funds, or financing, necessary to satisfy the balloon payments to Global in three years of all then-outstanding amounts.

Confirmation of the plan is doubtful. Not only are there the daunting issues of feasability, the proposed treatment of Global is, according to Global credit manager Douglas Stipcich, likely to lead to Global's rejection of the plan and

---

[19] *See* § 362(g)(2).

MEMORANDUM OF DECISION - 13

objection to confirmation.  As Debtor has no unsecured creditors, and only one creditor other than Global (*i.e.*, Idaho County), there are potential issues with Debtor's ability to satisfy all the confirmation requirements of § 1325(a) and (b).  Though confirmation issues are not before the Court at this time, the standards of § 362(d)(3)(A) and § 362(d)(2)(B) do require Debtor to establish a "reasonable likelihood" of plan confirmation within a reasonable time.  Debtor has not met that burden.

The Stay Motion will therefore be granted under § 362(d)(3) and § 362(d)(2).  Further, given the evidence and the findings above, the Court concludes that § 362(d)(1) stay relief for "cause," including lack of adequate protection, is also warranted.

### B. Amended disclosure statement

The final issue is that of approval under § 1125 of the amended disclosure statement.  The Code requires Debtor to provide "adequate information."[20]  "The

---

[20] In pertinent part, § 1125(a)(1) provides:

(a) in this section –

    (1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in

(continued...)

MEMORANDUM OF DECISION - 14

determination of what is adequate information is subjective and made on a case by case basis [and] is largely within the discretion of the bankruptcy court." *Computer Task Grp., Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 193 (9th Cir. BAP 2003).  *See generally* 7 Collier ¶ 1125.02[1] (noting general standard and situational flexibility), and ¶ 1125.02[2] (identifying 19 common factors under case law).

Granting Global relief from the automatic stay has the practical effect of rendering debate over the adequacy of the disclosure statement moot, given the particular characteristics of this case.  However, the Court generally agrees with the objections to the disclosure statement raised by Global.  Moreover, as the foregoing discussion illustrates, the Court discerns serious problems with Debtor's concept of reorganization as reflected by the plan and the disclosure statement.  There are many unanswered questions as to how Debtor will be able to achieve what it proposes.  The cardinal standard for § 1125 approval is that the disclosure statement provide the "adequate information" needed for creditors to evaluate whether, and how, the plan will be effectuated so that they might decide whether to accept it.  Under the circumstances, the Court finds the disclosure statement

---

[20](...continued)
determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]

MEMORANDUM OF DECISION - 15

cannot be approved under the standards of § 1125. The objection of Global will be sustained.

**CONCLUSION**

Upon the foregoing, the Court determines that the Stay Motion is well taken, and stay relief will be granted under § 362(d)(1), (2), and (3). The objection to the disclosure statement will be sustained and the disclosure statement disapproved. Counsel for Global may submit proposed orders accordingly.

DATED: July 13, 2011

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

MEMORANDUM OF DECISION - 16